JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant Joel O. D'Hue, M.D. (d.o.b. August 27, 1946), appeals from a host of alleged errors allegedly committed by the trial court in the underlying divorce action involving his spouse, defendant-appellee Linda S. D'Hue, n.k.a. Linda Sims (d.o.b. June 2, 1967). For the reasons adduced below, we affirm.
 {¶ 2} A review of the record on appeal indicates that appellant, an otolaryngologist, received his medical degree from Emory University in the 1970's. Following medical school, appellant received five years of additional medical training, finishing in 1981. Appellant then opened a medical practice in Marion (Marion County), Ohio. After approximately eighteen months in Marion, appellant moved to Atlanta during his divorce from his first wife. Appellant then returned to Ohio in 1984 and set up his medical practice in offices in Norwalk and Sandusky (respectively Huron and Erie Counties), Ohio. In 1989, appellant, who had purchased a home on Rohde Street in Sandusky in 1988 for $62,000 during his practice there, decided that he wanted to again move his practice.[1] Tr. 226-227. In 1990 appellant moved to Cleveland Heights, Ohio, and set up a medical practice at Severance Medical Arts Building in that city. During the early years of this practice, when he did not have many patients, appellant worked part-time at local hospital emergency rooms and at Kaiser Permanente Medical Group in order to earn more money while his private practice grew.
 {¶ 3} Appellant first met the appellee in the summer of 1991 while the two participated in a healthcare program at Case Western Reserve University which was dedicated to enhancing healthcare careers for African-American students.[2] Appellant, who was born and reared through high school in Jamaica, was appellee's mentor in the program. Following the conclusion of this six-to-eight week summertime program, appellant pursued appellee romantically and the two began to date one another. During 1991, appellee attended a biochemistry course at the University of Pittsburgh; appellee admitted that this course was paid for by appellant. Tr. 32, 34. In the Fall of 1991, appellant admitted that he discussed having appellee move from her home in Aliquippa, Pennsylvania to Cleveland and work in his medical office while she prepared to retake the admission test for medical school. Tr. 142-143, 153. Appellee claimed that appellant asked her to marry him in late 1991, but she declined the offer at that time. Tr. 326-327. Appellant admitted giving appellee a $2,000 diamond solitaire engagement ring in 1991, but insisted that it was not until the summer of 1993 that she agreed to marry him. Tr. 156-157, 273, 665.
 {¶ 4} In 1992, prior to cohabitating, the parties found an ornate wooden dining room set while at the IX Center in Brook Park, Ohio. Appellant purchased the set for $7,000, paying $1,000 down payment on the date of purchase, followed by a second payment of $1,000 on April 13, 1994, and the $5,000 balance paid after the ceremonial marriage date. Tr. 201-206. At the 1999 trial, appellee valued the dining room set at between $12,500 and $15,000, and appellant valued the set at approximately $5,000. Tr. 642, 949.
 {¶ 5} Appellee began to cohabitate with appellant in his apartment and began to work, without pay, in appellant's medical office starting in late April or early May of 1992. According to appellee, she worked full-time in the office until October of 1998. Tr. 764. Her duties at the medical office included billing and receiving, collecting insurance payments, general administration, and training personnel. Appellant saw no need to pay appellee because he was paying all of her living expenses while they cohabitated. Tr. 528-529. Appellee testified that appellant paid all bills that were submitted to him after they began cohabitating. Tr. 325. Appellee admitted that she had no funds of her own. Tr. 329. Appellee testified that she worked for free because appellant couldn't afford to pay her when she first worked at the office and that she believed they were going to be wed. Tr. 753-756.
 {¶ 6} Appellee brought with her to Cleveland a car (a 1984 Audi GT coupe), a television set, a VCR, and an Army Aviation credit union account with a small balance. At that time, appellant's office also employed Ms. Norquetta Lockett at the rate of approximately $5 to $6 per hour as a general office worker. Tr. 148-149. Appellant, despite his misgivings, had also just acquiesced to appellee's suggestion that he hire her brother, who appellant had permitted to live in his apartment rent free for a few months. He paid appellee's brother between $5 to $6 per hour, which works out to $10,000 to $12,000 annually. Tr. 156. The appellee's brother worked at appellant's office for several months. Appellant testified that appellee told him upon moving in that she came to help her brother get out of Aliquippa, that she intended to stay for only one year and then leave and pursue her career. Tr. 151. Appellee denied making this one-year commitment. Tr. 865.
 {¶ 7} Appellant testified that he paid all the bills for himself and appellee. Tr. 155.
 {¶ 8} According to appellee, shortly after the 1991 engagement ring was given, the two began to purchase furnishings and search for a suitable house to purchase. Tr. 804, 807. Unable to find a home to their liking, they decided in late 1992 or early 1993 to build a custom designed home instead. Tr. 805. The parties found a parcel of land at 6174 Penfield Lane in Solon, Ohio, and engaged the services of a builder and an architect. According to appellee, she was involved in making decisions involving the design and construction of the home. Tr. 806-807.
 {¶ 9} The parties were formally married in a ceremony conducted on June 18, 1994, in Aliquippa, Pennsylvania.
 {¶ 10} The parties moved into their 6,500 square foot custom designed home in August of 1994. This home was purchased for approximately $654,000, with $450,000 of that amount being the subject of a mortgage.[3] Tr. 209-210. The down payment amount came from appellant taking a second mortgage on his pre-marital Sandusky house in the amount of $54,000, borrowing $20,000 from his retirement fund, and the remainder from his personal earnings. Tr. 211-213, 220-221. This second mortgage on the Sandusky home was repaid when appellant refinanced the marital home in Solon in September of 1998. Tr. 215-216; Plaintiff's Exhibit 14. The loan from his retirement account was repaid from earnings in December of 1994 during the marriage term. Tr. 216. Appellant also paid for certain changes to the home's design by taking a loan of $45,660 from Society Bank. Tr. 225. At the time of the 1999 trial, the monthly payment on the mortgage was $3,600, which did not include annual property taxes in the amount of $10,000. Tr. 242-243.
 {¶ 11} The tax returns in the record reflect that appellant's income generally rose over the years while he was practicing medicine in the Cleveland area. The federal tax records for appellant's personal income tax reflect the following gross income from all sources: 1992 — $151,051; 1993 — $256,364; 1994 — $241,190; 1995 — $238,975; 1996 — $208,446; 1997 — $241,815; proposed 1998 — $140,665, with a refund of $10,000. The federal tax returns for appellant's medical practice reflect the following amounts of gross receipts: 1991 — $92,021, for a reported loss of $18,720 by the practice; 1992 — $164,730; 1993 — $296,706; 1994 — $308,645; 1995 — $430,360; 1996 — $395,679; 1997 — $472,275; proposed 1998 — $359,661. Appellant attributed the increase in earnings to his seeing more patients as the practice grew. Tr. 514, 642. Appellee attributed the increase in income to greater efficiencies imposed by her efforts in administering the office and its finances. Tr. 742. Appellant attributed the decline of receipts in the last year to his having started studying for a health care-related MBA program at Baldwin Wallace College in late 1997, to the fact that he had stopped seeing patients on Wednesdays and Saturdays in order to pursue the MBA, to the stress caused by the divorce proceedings causing interruptions in his work, and to changes in reimbursement in the federally funded Medicare program. Tr. 476-477, 642-643. This MBA program, which cost $30,000, was paid by appellant as an expense through his medical practice. Tr. 485-486. Appellee attributed the decline in appellant's income to her not working as much, or at all, at the appellant's office in 1997 to 1998.
 {¶ 12} Joint Exhibit 1, at paragraph 37, placed the increase in the value of the medical practice, from 1992 to the time of trial, at $120,000.
 {¶ 13} During the 1990's, appellant made semi-regular contributions to a number of individual retirement investments during the time the parties were together. The account balances in these accounts reflect the following: per stipulation filed in March of 2000, the accumulated value of the Vanguard Aggressive Growth Fund was $208,270.22 between March of 1992 and September of 1999[4]; per stipulation filed in March of 2000, the accumulated value of the Calvert Group account, which was later renamed The Advisor's Group, between March of 1992 and October of 1999 was $41,608.64[5] — $152,870.30; Victory Tax Free Money Market Fund at Key Bank, in December of 1998 — $19,320; Victoria Mutual account valued at $3,983 per Joint Exhibit 1[6].
 {¶ 14} During their time together, appellant, in addition to providing appellee with a comfortable lifestyle, the use of numerous credit cards and access to money, paid off the $750 balance on her Audi vehicle and, according to appellant, the remainder of approximately $8,000 of appellee's student loans. Tr. 176-182. These payments began in 1992 and concluded in 1997. Tr. 178, 181.
 {¶ 15} Beginning in August of 1997, appellee began to squirrel away portions of moneys which she had received from appellant. Tr. 845, 944. Appellee testified that the purpose of this saved money, which she hid in a purse, was destined for furniture purchases at the marital home and to purchase the Lexus automobile outright when the business lease expired. Tr. 845, 943.
 {¶ 16} Appellee testified that she asked appellant for a divorce in April of 1998. Tr. 865. Appellee opened an individual account in her name only on April 29, 1999, at a Charter One Bank branch in Solon, Ohio, funded, according to appellee, by monies she had saved in the purse. Tr. 868, 871. It is undisputed that appellee transferred sums of money from the parties' joint accounts and the saved money in the purse, to her credit union and Charter One accounts. These transfers from the joint accounts were made without prior knowledge of the appellant. Eventually, the majority of the monies in appellee's Charter One account was transferred to an account she had opened in Gahanna, Ohio.[7] Tr. 872. The record also indicates that appellant had two boats. The first boat, a 1986 Carver 28-foot motor yacht, was purchased prior to appellant meeting the appellee. At the time of trial, this older boat had a fair market value, according to appellant, of between $26,000 to $32,000. Tr. 159. The mortgage on this older boat at the time of trial was $31,117, payable at approximately $500 per month. Tr. 158, 246. The second boat, a 1994 Carver 39-foot motor yacht, was purchased by appellant in October of 1998 (approximately three months after the divorce filing) for $150,000 (including taxes). Of that purchase price, the $16,000 down payment was paid by a loan from appellant's medical practice and appellant mortgaged the remaining balance of $134,000. Tr. 161-162, 171. At the time of trial, appellant valued the boat at between $132,000 to $133,000, and appellant owed approximately $132,570 on the boat's mortgage, payable at approximately $1,000 per month. Tr. 162. Joint Exhibit 1, at paragraphs 32 and 33, valued the boat at $134,000 with a lien of $132,570.
 {¶ 17} As for automobiles, the record reflects a number of them which are relevant. As previously noted, appellee had a 1984 Audi prior to meeting appellant. Prior to meeting appellee, appellant had a 1989 Mercedes which was originally purchased through his medical practice, but later bought by appellant from the medical practice for appellant's personal use. Tr. 592-593. When the appellant's medical practice leased a 1995 Lexus LS 400 for appellant's use, the Mercedes was driven primarily by appellee. During the marriage, appellant made $3,325 in payments on the Mercedes. See Joint Exhibit 1 at paragraph 25.
 {¶ 18} The record also demonstrates that appellant purchased a 1991 Mazda Protege and gave it to his son during the marriage. Tr. 623-627. Joint Exhibit 1, at paragraph 27, valued this Mazda at $2,450.
 {¶ 19} The appellant's life insurance policy at the time of trial had a cash surrender value of $11,581. See Joint Exhibit 1 at paragraph 33.
 {¶ 20} Dr. D'Hue filed for divorce on July 31, 1998. Defendant-appellee answered and counterclaimed for divorce on August 21, 1998.
 {¶ 21} On December 3, 1998, appellant was ordered, without an evidentiary hearing, to pay through the Cuyahoga Support Enforcement Agency ("CSEA") $4,500 per month to appellee as temporary spousal support commencing August 21, 1998. Thereafter, appellant filed on December 14, 1998, a request for an oral evidentiary hearing on the temporary spousal support matter.
 {¶ 22} Testimony also reflects that appellee transferred from appellant's account to her credit union account a total of $6,000 without appellant's prior consent or knowledge ($2,000 on November 25, 1998, and $4,000 on December 16, 1998). See Plaintiff's Exhibits 39 and 40.
 {¶ 23} On December 31, 1998, appellant posted a $4,500 bond with the Clerk of Courts to secure payment of temporary spousal support.
 {¶ 24} In early 1999, appellee obtained orthodontic braces at a cost of $2,500 without the knowledge or consent of appellant. Appellee charged this dental bill to appellant's Shell MasterCard account. Appellant paid this bill prior to the time of trial.
 {¶ 25} On August 2, 1999, the parties agreed that appellant would pay temporary spousal support in the amount of $3,500 per month, plus 2% poundage, and pass the determination of any temporary support arrearage incurred through the divorce proceedings to the time of trial, on the condition that appellant move out of the marital home. Journal Vol. 3430, page 344, et seq., at paragraph 11. Despite these temporary spousal support orders, appellant paid no temporary spousal support to appellee. Tr. 792.
 {¶ 26} Appellee moved out of the marital home in Solon on August 15, 1999 and took up residence in Gahanna, Ohio. Tr. 838. From the time of the divorce filing to the date of appellee moving out of the marital home, appellant paid household related expenses, but did not pay bills incurred by appellee.
 {¶ 27} On August 16, 1999, appellee began employment with Bristol, Meyers, Squibb, Inc., as a pharmaceutical sales representative with a base annual salary of $40,000, plus benefits, and commissions on sales. Tr. 778-779. At the time of trial she had yet to garner any commissions because she was still in company training.
 {¶ 28} On November 15, 1999, the court ordered the release of the $4,500 bond amount to appellee, which she did receive.
 {¶ 29} The matter was tried to a magistrate on October 5, 6, and 7, and December 8, 9, and 13, 1999. Also under consideration at this hearing were the following: appellant's request for oral hearing filed December 14, 1998; appellee's motion to show cause due to nonpayment of temporary spousal support, filed March 23, 1999 (#30530); and, appellee's motion for attorney fees, filed March 23, 1999 (#30531).
 {¶ 30} At the trial, both parties, in addition to the information contained above, detailed their claimed current living expenses ad nauseam.
 {¶ 31} The magistrate issued her decision on April 27, 2001, with findings of fact. In particular, the magistrate concluded the following: (1) that the parties had an economic partnership similar to marriage when they cohabitated and began to work together in April of 1992 and that appellee was an integral key to the growth of appellant's practice; (2) based on this interdependence, the commencement date of the marriage for purposes of determining the marital estate was April of 1992; (3) there is $34,747 in marital equity in the Sandusky home; (4) the marital home in Solon has a fair market value of $654,000, is encumbered by a mortgage of $503,007, see Joint Exhibit 1, at paragraph 14, leaving equity in that residence of $151,000; (5) the down payment on the marital home was repaid with marital income.
 {¶ 32} The magistrate awarded the appellant the following: (1) the $120,000 value in the medical practice; (2) 50% of the marital interest in the Vanguard Fund account in the amount of $104,135.11; (3) 50% of the marital interest in the Calvert Securities account in the amount of $20,804.32; (4) the teak dining room set with a value of $12,000; (5) the entire marital interest in the 1989 Mercedes valued at $3,325; (6) appellee's interest in the equity of the marital home in Solon in the amount of $75,500 ($654,000 — $503,000 lien = $151,000); (7) the entire marital equity in the Sandusky home in the amount of $34,477; (8) the entire marital interest in the 1991 Mazda Protege in the amount of $2,450; (9) the 1994 Carver yacht with an equity balance of $1,430 ($134,000 — $132,570 lien = $1,430); (10) the life insurance policy with a cash surrender value of $11,581; (11) the entire marital interest in the Victoria Mutual account valued at $3,983; (12) the entire marital interest in the Key Bank account in the amount of $19,301; (13) the 1998 joint tax refund of $10,000. In total, the magistrate awarded appellant marital assets in the amount of $369,547. See magistrate's decision at 12. The magistrate believed that an equal division of this amount would indicate that appellant owed appellee $180,825. Id. As recognized by the magistrate, the parties agreed on August 2, 1999 that appellant was entitled to a $5,000 credit toward the final property settlement. Id. Thus, the amount owed to appellee, according to the magistrate, was $175,824. Id.
 {¶ 33} The magistrate then found that this owed amount of $175,824 would bear interest at the rate of 5% annually, and that this owed amount would be paid by appellant to appellee in monthly installments of $1,500 for thirty-six (36) months and $5,000 monthly thereafter until such time as the total amount is paid in full. Magistrate's decision at 20.
 {¶ 34} The magistrate awarded the appellee the following as property division: (1) 50% of the marital interest in the Vanguard Fund account in the amount of $104,135.11; (2) 50% of the marital interest in the Calvert Securities account in the amount of $20,804.32; (3) the entire amount of the Army Aviation credit union account in the amount of $7,898.
 {¶ 35} The magistrate, after considering the earning ability of the parties, their expenses, their standard of living, their educations, assets and liabilities of the parties, the tax brackets of the parties as it impacts spousal support, appellee's lost opportunities in her being out of the work force for seven years while she worked in appellant's medical practice without pay, and the contributions of the parties to the production of marital income, further awarded spousal support to appellee for sustenance and support for three years in the amount of $2,500 per month. Magistrate's decision at 12-16.
 {¶ 36} The magistrate also awarded appellee a $28,250 arrearage in temporary spousal support as of December 15, 1999, and $15,000 from appellant toward appellee's total claimed attorney fees of $37,200 (plus expert fees in the amount of $1,530). The arrearage was calculated as follows: (1) $2,500 per month from the day following the divorce filing to the day appellee moved out of the marital home (to-wit, August 1, 1998 to August 15, 1999, a period of 12.5 months @ $2,500 per month = $31,250); (2) plus, $2,500 per month from the day appellee moved out of the marital home to December 15, 1999 (to-wit, August 15, 1999 to December 15, 1999, a period of four months @ $2,500 per month = $10,000); (3) less, the $4,500 bond released to appellee on November 15, 1999; (4) less, the $6,000 in appellant's funds that appellee transferred to her credit union account; (5) less, the $2,500 orthodontia bill that appellee charged to appellant's Shell MasterCard account.
 {¶ 37} Finally, the magistrate recommended that appellee's motion to show cause, filed March 23, 1999, be granted due to the $28,250 arrearage in spousal support as of December 15, 1999. The magistrate recommended that appellant be found in contempt and sentenced to serve thirty days in jail or perform 200 hours of community service; the contempt citation could be purged, according to the magistrate, if appellant pay $5,000, plus 2% poundage, within thirty days of the order.
 {¶ 38} With leave of court, appellant filed on July 31, 2001, his objections to the magistrate's decision. On August 10, 2001, with subsequent permission of the court, appellant filed a supplement to his objections. On September 28, 2001, with leave of court, appellee filed her brief in opposition to appellant's objections.
 {¶ 39} The trial court overruled appellant's objections on January 11, 2002, and adopted the magistrate's decision. The court ordered the appellee to prepare a proposed judgment entry reflecting the recommended decision.
 {¶ 40} On February 13, 2002, the trial court issued its judgment entry of divorce for both parties, incorporating therein the magistrate's decision with its findings of fact. See Journal Vol. 3902, pages 773-812. In particular, the court ordered the following with respect to appellant: (1) as of December 15, 1999, he owed appellee $28,250 for temporary and permanent spousal support arrearage, with the court reserving jurisdiction to determine further arrearage between the date of hearing and the date of journalization of the divorce entry; (2) that appellant shall pay appellee, through CSEA, $800.70 per month on the support arrearage until that arrearage is paid in full; (3) that commencing on December 15, 1999, through August 14, 2002, appellant shall pay appellee, through the Ohio Child Support Payment Central, $2,550 per month as spousal support; (4) that appellant is awarded appellee's interest in the Solon marital home property, and hold appellee harmless on the mortgage, taxes and insurance for that property; (5) that appellant is awarded as property division, free and clear of any claim by appellee, all marital interest in appellant's medical practice, the dining room set, the 1989 Mercedes, the 1991 Mazda, the 1994 Carver boat, appellant's life insurance policy, the Victoria Mutual account, the Key Bank account, and the parties' joint 1998 income tax refund; (6) that appellant owes appellee $175,824 as property division, with 5% interest annually on the judgment therefore until the judgment is paid in full; (7) that appellant shall pay appellee $1,500 per month for thirty-six (36) months, and $5,000 per month thereafter until the property division sum of $175,824, plus accumulated 5% interest, is paid in full; (8) that appellant is awarded the furnishings, furniture, and appliances in the Solon marital home, with the exception of appellee's bicycle and photographs which are to be returned to appellee.
 {¶ 41} The court made the following orders with respect to appellee and the retirement/investment accounts: (1) she is awarded 50% of the marital portion of the Vanguard Funds account and 50% of the Calvert Securities account, with her shares therein being credited with all interest and investment income or losses attributable to her share of the account balances from December 15, 1999 to the date of total distribution to appellee; (2) she is awarded the Army Aviation credit union account.
 {¶ 42} The court granted the appellee's motion to show cause filed on March 23, 1999, holding appellant in contempt and sentencing him to thirty days in jail or, in the alternative, to serve 200 hours of community service. The contempt could be purged if appellant pay $5,000, plus 2% poundage, within thirty days of the contempt order.
 {¶ 43} The court also granted appellee's motion for attorney fees in the amount of $15,000.
 {¶ 44} Costs of the proceeding were assessed against appellant.
 {¶ 45} The appeal from the trial court's February 13, 2002 ruling was filed by appellant on March 14, 2002. Eight assignments of error, which essentially repeat the objections previously filed to the magistrate's decision, are presented for review.
 {¶ 46} The first assignment of error states the following: "The court erred and abused its discretion in failing to rule upon appellant's motion to show cause, in overruling appellant's motion in limine, and in limiting the parties to seven and one-half (7 1/2) hours each to present their case." The three issues in this assignment will be discussed in the order presented.
 {¶ 47} Appellant argues that the trial court neglected to rule on his motion to show cause filed September 9, 1999. This motion sought sanctions for appellee allegedly having improperly removed a number of items of personal property from the marital home when she moved out. Contrary to appellant, the trial court impliedly addressed the subject motion when it awarded the furniture, furnishings and appliances in the marital home, except for appellee's bicycle and personal photographs, to the appellant. By not ordering appellee to return the suspect items of personal property, the motion was effectively denied.
 {¶ 48} Appellant next argues that the court abused its discretion in overruling his oral motion in limine made at trial. See Tr. 286-288. This motion sought to preclude the appellee from arguing that the marriage commenced prior to the ceremonial marriage date of June 18, 1994, since appellee, in her answer to the complaint and in her counterclaim for divorce, alleged that the date of marriage was June 14, 1994. Appellant overlooks the fact that appellee filed on November 15, 1999, a motion to amend the pleadings pursuant to Civ.R. 15(B) so that the pleading could conform to the evidence which, according to appellee, demonstrated that the date of the marriage was prior to the ceremonial wedding date. This motion was granted by the court on December 2, 1999. Given the resolution of the motion to amend the pleadings, and the fact that R.C. 3105.171(A)(2)(b) provides the court with jurisdiction to select a date other than the ceremonial wedding date for purposes of equitably determining what comprises the marital estate for a division of property assessment, we cannot conclude that the trial court abused its discretion in overruling the motion in limine.
 {¶ 49} Finally, appellant argues in this assignment that the court abused its discretion in limiting the parties to 7 1/2; hours per party within which to present their case to the magistrate. Under the abuse of discretion standard, the trial court's discretion is not absolute, but it is very broad. Because the trial court's discretion is not absolute, appellate courts, as well as the Ohio Supreme Court, must review the trial court's decision to determine whether the trial court's action was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140. From the record of the magistrate's hearing, consisting of a transcript encompassing 984 pages, dozens of exhibits, and principally the testimony of the parties, we conclude that the issues were adequately explored by the parties before the magistrate. In particular, the issue of when the marriage began for purposes of determining the marital estate was extensively litigated by the parties before the magistrate, thereby providing a sufficient basis of evidence upon which the magistrate, and the court, could determine this thorny issue.
 {¶ 50} The first assignment of error is overruled.
 {¶ 51} The second assignment of error attacks the award of spousal support and the arrearage for temporary spousal support.
 {¶ 52} The standard of review for an award of spousal support was recently addressed by this court in Oleksy v. Oleksy, Cuyahoga App. No. 80766, 2002-Ohio-5085, at ¶ 12-29, 2002 Ohio App. LEXIS 5131 at 6-9:
 {¶ 53} "[*P12] A judge has a great deal of latitude in awarding spousal support and his decisions are reversible only where there is an abuse of discretion. n3 An abuse of discretion implies that the judge's attitude is unreasonable, arbitrary or unconscionable.n4
 Footnotes {¶ 54} "n3 Vanderpool v. Vanderpool (1997), 118 Ohio App.3d 876,878-79, 694 N.E.2d 164.
 {¶ 55} "n4 Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140, quoting State v. Adams (1980),62 Ohio St.2d 151, 157, 16 Ohio Op.3d 169, 404 N.E.2d 144.
 End Footnotes {¶ 56} "[*P13] Although the judge is granted freedom in making spousal support orders, he is constrained in the evaluation of the surrounding facts and circumstances by R.C. 3105.18, which mandates certain relevant factors to be considered when making such [**7] awards. n5 R.C. 3105.18(C)(1) sets out the factors that must be considered when contemplating an order of spousal support:
 {¶ 57} "[*P14] `In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 {¶ 58} "[*P15] `(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 [3105.1 7.1] of the Revised Code;
 {¶ 59} "[*P16] `(b) The relative earning abilities of the parties;
 {¶ 60} "[*P17] `(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 61} "[*P18] `(d) The retirement benefits of the parties;
 {¶ 62} "[*P19] `(e) The duration of the marriage;
 {¶ 63} "[*P20] `(f) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 64} "[*P21] `(g) The standard of living of the parties [**8] established during the marriage;
 {¶ 65} "[*P22] `(h) The relative extent of education of the parties;
 {¶ 66} "[*P23] `(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 67} "[*P24] `(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 68} "[*P25] `(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 69} "[*P26] `(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 70} "[*P27] `(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 71} "[*P28] `(n) Any other factor that the court expressly finds to be relevant and equitable."
 Footnotes {¶ 72} "n5 See Kaechele v. Kaechele (1988), 35 Ohio St.3d 93,518 N.E.2d 1197, paragraph one of the syllabus.
 End Footnotes [**9] {¶ 73} "[*P29] A judge is required to `indicate the basis for [the spousal support] award in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law.' n6 * * *
 Footnotes {¶ 74} "n6 Kaechele, 35 Ohio St.3d at 93.
 End Footnotes " {¶ 75} In the present case, the magistrate and trial court reviewed the extensive testimony and evidence in the record concerning the various items to be considered under R.C. 3105.18. Based on these items, which were amply documented by the testimony of the parties, the court did not abuse its discretion in concluding that the award of spousal support was appropriate and reasonable under the circumstances.
 {¶ 76} The second assignment of error is overruled.
 {¶ 77} The third assignment of error argues that the court abused its discretion in ordering appellant to pay "additional sums toward arrearage on spousal support as well as sums for property division and for a purge order." Appellant's brief at 18.
 {¶ 78} In this assignment, appellant complains that the evidence indicated that appellant could not afford a total monthly payment to appellee in the amount of $4,785 for three years (which represents payment on the temporary support arrearage, payment of monthly spousal support, and payment toward the property division), $5,000 monthly thereafter on the property division until the property division amount is paid in full, in addition to a one-time contempt purge amount of $5,000.
 {¶ 79} The evidence reflects that appellant is capable of earning, on average, at least $200,000 annually. These earnings are adequate to support the payment to appellee of approximately $60,000 annually until the divorce judgment amounts are paid in full, in addition to a one-time contempt purge amount.
 {¶ 80} The third assignment of error is overruled.
 {¶ 81} The fourth assignment of error argues that the court abused its discretion in determining that the marriage commenced in April of 1992 when the parties began to cohabitate and appellee began to work at appellant's medical office without pay. Appellant further argues that this improper use of the earlier marriage commencement date should prompt a recalculation and reapportionment of the marital assets using the ceremonial wedding date as the date of the commencement of the marriage.
 {¶ 82} R.C. 3107.171, titled, "Equitable division of marital and separate property; distributive award," provides the court with authority to choose the de facto date of a marriage's commencement for purposes of determining marital property:
 {¶ 83} "(A) As used in this section:
 {¶ 84} "(1) `Distributive award' means any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, that are made from separate property or income, and that are not made from marital property and do not constitute payments of spousal support, as defined in section 3105.18 of the Revised Code.
 {¶ 85} "(2) `During the marriage' means whichever of the following is applicable:
 {¶ 86} "(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;
 {¶ 87} "(b) If the court determines that the use of either or bothof the dates specified in division (A)(2)(a) of this section would beinequitable, the court may select dates that it considers equitable indetermining marital property. If the court selects dates that it considers equitable in determining marital property, `during the marriage' means the period of time between those dates selected and specified by the court." (Italicization added.)
 {¶ 88} In the recent case of Abernethy v. Abernethy, Cuyahoga App. No. 80406, 2002-Ohio-4193, at ¶ 19, 2002 Ohio App. LEXIS 4363 at 6, this court stated the following with respect to the choosing of a de facto date under R.C. 3105.171(A)(2)(b):
 {¶ 89} "In order to achieve an equitable distribution of property, the trial court must be allowed to use alternative valuation dates where reasonable under the particular facts and circumstances of the case. Langer v. Langer, 123 Ohio App.3d 348, 704 N.E.2d 275 (1997), appeal dismissed (1997), 80 Ohio St.3d 1473, 687 N.E.2d 470. `The determination as to when to apply a valuation date other than the actual date of divorce is within the discretion of the trial court and cannot be disturbed on appeal absent a demonstration of an abuse of discretion.'Gullia v. Gullia (1994), 93 Ohio App.3d 653, 666, 639 N.E.2d 822, appeal dismissed (1994), 70 Ohio St.3d 1409, 637 N.E.2d 6.
 {¶ 90} In the present case, we conclude that the court did not abuse its discretion in equitably choosing the de facto date of the marriage as April of 1992. It was at this time, as recognized by the court, that the parties started functioning as husband and wife, both socially and economically. At that time, their finances were, substantially, as one. Appellant paid for everything from that point forward and appellee was financially dependent upon appellant. Bradleyv. Bradley (July 5, 2001), Cuyahoga App. No. 78400, 2001 Ohio App. LEXIS 3028 (de facto date of marriage recognized where parties were financially interdependent from that point). They had effectively pooled their resources and worked toward a common purpose, to the extent of purchasing property in anticipation of wedding. See Flick v. Flick, Butler App. No. CA2001-05-111, 2001-Ohio-8673, 2001 Ohio App. LEXIS 4933. The parties were truly interdependent emotionally from that point, with appellee starting to work in the appellant's medical office and effect changes and efficiencies therein which, as the income records indicate, demonstrably aided the growth of the medical practice, appellant's income, and, in turn, the parties' lifestyle. These attachments, emotionally and financially, buttress the court's use of the de facto date of marriage commencement. Having concluded that the court did not abuse its discretion in using the de facto commencement date of the marriage, there is no need to disturb the court's assessment of the extent of marital property.
 {¶ 91} The fourth assignment of error is overruled.
 {¶ 92} The fifth assignment of error argues that the court abused its discretion in the assessment of certain items of property as marital property.
 {¶ 93} Appellant asserts that the entire interest in the Sandusky home should be classified as pre-marital property since he: (1) purchased that home prior to meeting appellee; (2) had paid off the original mortgage on that home on February 17, 1993, Tr. 333, prior to the ceremonial wedding date. This argument overlooks the fact that appellant had made payments on the original mortgage subsequent to the 1992 de facto commencement date of the marriage. Thus, the court did not abuse its discretion in considering those post-de facto commencement date payments on the Sandusky home mortgage to be a marital asset subject to property division and distribution.
 {¶ 94} With regard to the marital home in Solon, appellant argues that the entire down payment for that home came from non-marital assets since: (1) he had borrowed some of the down payment money as a loan from one of his retirement accounts; (2) he had financed another portion of that down payment by taking out a second mortgage loan on the Sandusky home. Again, appellant overlooks the fact that the down payment on the marital home was made in 1993, subsequent to the 1992 de facto commencement date of the marriage, and that, apart from the two loans, the down payment was funded through appellant's then current earnings. These loans were repaid during the term of the marriage through appellant's earnings. Thus, the down payment amount, represented by the repaid loan amounts and the earnings used to fund the remainder of the down payment, was a marital asset subject to property division and distribution.
 {¶ 95} Finally, appellant argues that the court erred in finding that he started his medical practice in 1989. This is an argument over semantics. Appellant premises his argument on the fact that he had a practice in medicine prior to moving to Cleveland Heights. The record demonstrates through the appellee's testimony that the Cleveland Heights medical practice, started in 1989 by appellant, was not a continuation of appellant's previous medical practice he had operated in Sandusky and Huron counties; that the Sandusky practice "didn't follow him here." Tr. 53. The Cleveland Heights practice was essentially a new practice, in a new city and location, with a new patient base.
 {¶ 96} The fifth assignment of error is overruled.
 {¶ 97} The sixth assignment of error attacks the award of $15,000 in attorney fees to appellee.
 {¶ 98} In Abernathy, supra, 2002-Ohio-4193, at ¶ 79-82, 2002 Ohio App. LEXIS 4363 at 19-21, this court considered an award of attorney fees, stating:
 {¶ 99} "[*P79] We begin our analysis with R.C. 3105.18(H), which states:
 {¶ 100} "[*P80] `(H) [**20] In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, itshall determine whether either party will be prevented from fullylitigating that party's rights and adequately protecting that party'sinterests if it does not award reasonable attorney's fees.' (Emphasis added.)
 {¶ 101} "[*P81] As we stated in Meister v. Meister (Oct. 12, 2000), Cuyahoga App. No. 77110, 2000 Ohio App. LEXIS 4751:
 {¶ 102} "[*P82] `The payment of attorney's fees primarily is the function of the party who retains the attorney. Farley v. Farley (1994),97 Ohio App.3d 351, 646 N.E.2d 875. An award of attorney's fees by the trial court under R.C. 3105.18(H) will not be reversed absent an abuse of discretion. Rand v. Rand (1985), 18 Ohio St.3d 356, 359, 18 Ohio B. 415,481 N.E.2d 609. [**21] When awarding attorney's fees, the trial court must consider the same factors considered when making an award of spousal support. Williams v. Williams (1996), 116 Ohio App.3d 320, 328,688 N.E.2d 30. Two important considerations are the financial ability of the payor spouse and whether a failure to award reasonable attorney's fees will prevent either party from fully litigating his rights and adequately protecting his interest. Id. This court's review of an award of attorney's fees is limited to determining whether (1) the factual considerations upon which the award was based are supported by the manifest weight of the evidence, or (2) the trial court abused its discretion. Gourash v. Gourash (Sep. 2, 1999), Cuyahoga App. Nos. 71882 and 73971, 1999 Ohio App. LEXIS 4074, unreported.'"
 {¶ 103} Appellant argues in this assignment that the court erred in finding that appellee had incurred attorney fees in the amount of $37,200 because appellee was, according to appellant, being billed at the unreasonable rate of $425 hourly. Appellant's brief at 37.
 {¶ 104} Appellant conjures this $425 hourly rate through simple addition because defendant-appellee's counsel allegedly "testified that she charged LINDA SIMS `$250 plus 175 for each hour' of trial time." See Tr. 959. Next, using conclusory statements without elucidation or reasoning or citations to the record demonstrating the claimed error, appellant simply makes the statements that the court erred in finding that the legal services incurred by appellee were necessary, that the marital assets and liabilities were sufficient to support an award of attorney fees, that appellee had sufficient assets to pay her own attorney fees, and that appellant did not have the ability to contribute toward appellee's attorney fees. Appellant's brief at 37-38.
 {¶ 105} The record reflects that defense counsel, an attorney in practice since 1973, with a practice consisting of 95% domestic relations cases, regularly bills her services at the hourly rate of $250. Tr. 955. When retained in August of 1998 by the defendant-appellee, counsel Alice Rickel stated an hourly rate of $225, and an hourly rate for her associate, attorney Linda Schuster, of $175. Tr. 955. Counsel Rickel detailed the difficulties and complexities involved in the representation. Tr. 955-957. The defense detailed services in this contentious action well in excess of $37,000 in fees based on the hourly rates of defense counsel.
 {¶ 106} On cross-examination, counsel Rickel testified that she billed on the quarter hour. Also on cross-examination, counsel Rickel admitted that she was billing her client $250 plus $175 for each hour of the trial. Tr. 959. This was so because both defense counsel obviously attended the trial. In response to a question from the magistrate, counsel Rickel also stated that, other than trial time, the client was not billed for both defense counsel if they appeared at a proceeding. Tr. 959. Counsel Rickel then explained that if her billing statement reflected any double billings, that these were in error and should be deleted. Tr. 959-960.
 {¶ 107} Based on the evidence presented, the earning abilities and liabilities of the parties, we conclude that the trial court applied the necessary factual considerations for an award of attorney fees and that this award was reasonable and supported by the manifest weight of the evidence. Accordingly, the court did not abuse its discretion in making an award of attorney fees representing approximately 40% of the value of the legal service rendered.
 {¶ 108} The sixth assignment of error is overruled.
 {¶ 109} The seventh assignment of error argues that the court abused its discretion in ordering that the payment on the $175,824 property division incur annual interest at the rate of 5% until that division liability is paid in full.
 {¶ 110} As stated in Zeefe v. Zeefe (1998), 125 Ohio App.3d 600,709 N.E.2d 208, 1998 Ohio App. LEXIS 199 at 19-20:
 {¶ 111} "There is no requirement, moreover, that a trial court award interest on the payment of property [***20] division over time, that decision being left to the sound discretion of the trial judge.Koegel v. Koegel (1982), 69 Ohio St.2d 355, 357, 432 N.E.2d 206; Sergiv. Sergi, 1996 Ohio App. LEXIS 3241 (July 31, 1996), Summitt App. No. 17476; Clark v. Clark, 1995 Ohio App. LEXIS 512 (Feb. 8, 1995), Summit App. No. 16516, unreported."
 {¶ 112} Considering that the property division is to be paid out over time, the present value of that award is necessarily degraded over the time of repayment due to inflation. There is no reason that appellee's interest in the unpaid portion should be dissipated due to the lack of interest which would serve to protect the value of the unpaid portion of that award over time. Accordingly, we cannot conclude that the court abused its discretion when it awarded interest on the property division.
 {¶ 113} The seventh assignment of error is overruled.
 {¶ 114} The eighth, and final, assignment of error argues that the court abused its discretion in ordering appellant to pay the costs of the action. Appellant's entire argument with respect to this assignment consists of the following unsupported sentence: "When the trial court makes an equal division of a marital estate, the court abuses its discretion in ordering one of the parties to the action to pay all of the court costs." Appellant's brief at 39.
 {¶ 115} In Slowbe v. Slowbe (Jan. 13, 2000), Cuyahoga App. No. 75520, 2000 Ohio App. LEXIS 74 at 11:
 {¶ 116} "Civ.R. 54(D) permits a trial court to award a prevailing party the costs of litigating that party's claim. Civ.R. 54(D) provides:
 {¶ 117} "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs.
 {¶ 118} "The court in Vance v. Roedersheimer (1992),64 Ohio St.3d 552, 597 N.E.2d 153 stated:
 {¶ 119} "This rule gives the trial court broad discretion to assess costs, and the court's ruling will not be reversed absent an abuse of that discretion. (Citations omitted)."
 {¶ 120} In the present action, divorce was granted on the pleadings of both parties. Thus, picking the prevailing party is impossible; each prevailed to some extent. Given the broad discretion the trial court maintains in assessing costs where there is no true prevailing party, and considering the parties' respective earning abilities and liabilities, and the utter lack of supporting argument by appellant with citations to the record demonstrating error, there is insufficient evidence upon which to conclude that the court abused its discretion in awarding costs against appellant.
 {¶ 121} The eighth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant her costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court, Domestic Relations Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.
PATRICIA A. BLACKMON, J., CONCURS; COLLEEN CONWAY COONEY, J., CONCURSIN JUDGMENT ONLY.
[1] At trial, appellant testified that this property was being rented for approximately $625 per month, and that property taxes are approximately an additional $800 per year (or roughly $66 per month). Tr. 585-588. The property was originally encumbered by a mortgage held by Society National Bank. This first mortgage was paid off on February 13, 1993 from appellant's medical practice earnings. See Joint Exhibit 1, paragraph 20. $34,477 was used to satisfy that mortgage. Plaintiff's Exhibit 128.
[2] Appellee testified that she was reared in Aliquippa, Pennsylvania and received a Bachelor's degree in biology in 1989 from Washington and Jefferson College. Tr. 26. Following graduation she fulfilled her ROTC duty and served in the Army officer corps as an administrative specialist. She was discharged from the Army in July of 1999. Tr. 30-31.
[3] The marital home, which had a mortgage balance at the time of $475,000, was refinanced on August 17, 1998 (approximately three weeks after the filing for divorce), for $508,000. Appellant could not remember what he did with the $32,000 represented by the difference between the mortgage balance and the amount refinanced. Tr. 529-532, 555, 558-559.
[4] According to the stipulations filed in March of 2000, at paragraph 2, the value of the Vanguard Funds account accumulated prior to March 2, 1992, was $48,561.93. Therefore, subtracting this amount from the September, 1999 valuation of $256,832.15 leaves a balance of $208,270.22.
[5] According to the stipulations filed in March of 2000, at paragraph 3, the value of the Vanguard Funds account accumulated prior to March 2, 1992, was $111,261.66. Therefore, subtracting this amount from the September, 1999 valuation $152,870.30 leaves a balance of $48,561.93.
[6] The Joint Exhibit balance reflects an overall value of $4,268, less a pre-marital balance of $285. Thus, the accumulated balance during the marriage was $3,983.
[7] At the time of the trial, appellee's Charter One Bank account balance was $551.79. Tr. 872.